So Ordered.

Dated: July 21, 2022



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Cornerstone Pavers, LLC,

Debtor.

Case No. 20-20882-gmh

Chapter 11

Cornerstone Pavers, LLC,

Plaintiff,

v.

Zenith Tech Inc.,

Defendant.

Adv. Proc. No. 21-02044-gmh

**DECISION AND ORDER ON WEST BEND MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT ON CLAIM OF ZENITH TECH INC.**

The central dispute in this adversary proceeding is between Zenith Tech Inc., which was hired by the Wisconsin Department of Transportation (DOT) to complete a highway-construction project, and Cornerstone Pavers, LLC, the debtor in the

underlying bankruptcy case, which was subcontracted by Zenith to perform some of the required work. During the project, Zenith terminated Cornerstone and replaced it with another subcontractor. Each now seeks to recover from the other its resulting damages for breach of the subcontract and the duty of good faith and fair dealing.

But first, the undercard: Zenith also seeks to recover from West Bend Mutual Insurance Company on a bond that Zenith alleges West Bend issued to insure the performance of the subcontract—whether by Cornerstone or, as Zenith maintains became necessary here, by someone else. West Bend denies any liability to Zenith on the bond and moves for summary judgment on Zenith's claim against it, asserting that the bond it issued does not insure the performance of the subcontract that Zenith and Cornerstone executed and, if it does, that Zenith failed to satisfy one or more conditions that the bond says must be satisfied before West Bend's obligations under its terms arise. Zenith disagrees.

I

The applicable standard on a motion for summary judgment is a familiar one: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Fed. R. Bankr. P. 7056. For purposes of this standard, a fact is material if a dispute about it "might affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). And a factual dispute is genuine "if the evidence is such that" it "may reasonably be resolved in favor of either party." *Id.* A genuine dispute as to a material fact "properly can be resolved only by a finder of fact", so if there are any such disputes, then "there is the need for a trial", and summary judgment must be denied. *Id.* Accordingly, when a party seeks summary judgment, the court must determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

For the most part West Bend and Zenith do not dispute what happened here:

Zenith entered into a highway-construction contract with the DOT and sought to hire Cornerstone as a subcontractor to do some of the required work. While Zenith and Cornerstone were negotiating the terms of their subcontract, but before they executed it, West Bend issued a bond insuring the performance of an agreement between them. That agreement is identified on the bond's cover page by project, price, and date, but the listed date is December 12, 2018, the date of an unexecuted draft of Zenith and Cornerstone's subcontract. The final, signed agreement is dated February 14, 2019. Zenith fired Cornerstone that June, hired a replacement subcontractor in July, and only then informed West Bend of its termination of the subcontract with Cornerstone. Zenith made a demand on the bond, but West Bend denied all liability, citing Zenith's failure to provide West Bend with advance notice that Zenith was considering declaring Cornerstone's default of the subcontract, among other things.

II

Although West Bend and Zenith broadly agree about what happened, and they agree that Wisconsin law governs their dispute, they strongly disagree about how the bond should be read under the governing law, including what their respective rights, responsibilities, and remedies are under its terms.

Under Wisconsin law, "the contracts of *paid sureties*"—as is the contract here, see ECF No. 71-10—"are to be treated as insurance contracts". *Wiegel v. Sentry Indem. Co.*, 287 N.W.2d 796, 799–800 (Wis. 1980). Ordinarily, "[i]nterpretation of an insurance contract presents a question of law." *SECURA Ins. v. Lyme St. Croix Forest Co., LLC*, 918 N.W.2d 885, 889 (Wis. 2018) (citing *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004)). That is, "where a dispute turns upon application of an insurance policy to underlying facts, interpretation of the insurance policy presents a question of law for the court." *Fontana Builders, Inc. v. Assurance Co. of Am.*, 882 N.W.2d 398, 411 (Wis. 2016). Policy language, given its "common and ordinary meaning", if "plain and unambiguous", is "enforce[d] . . . as written, without resort to rules of

construction or principles in case law." *Danbeck v. Am. Fam. Mut. Ins. Co.*, 629 N.W.2d 150, 154 (Wis. 2001) (citing *Henderson v. State Farm Mut. Auto. Ins. Co.*, 208 N.W.2d 423, 426 (Wis. 1973); *Hull v. State Farm Mut. Auto. Ins. Co.*, 586 N.W.2d 863, 867 (Wis. 1998)). Policy language that is ambiguous, meaning it is "susceptible to more than one reasonable construction", is typically construed, as a matter of law, "against the drafter, and in favor of the reasonable expectations of the insured." *Fontana Builders*, 882 N.W.2d at 412 (quoting *Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 824 (Wis. 2012)). All of which is to say, the need to interpret an insurance contract does not, in most cases, require a trial, as it typically raises only legal issues.

In limited circumstances, however, interpretation of an insurance contract raises issues of fact that must be presented to and resolved by a factfinder at a trial. Under Wisconsin law, "interpretation of a contract—insurance or otherwise—creates a question of fact for the jury *only* when extrinsic evidence illuminates the parties' understandings at the time they entered into the agreement." *Id.* at 411 (emphasis added) (citing *Thurston v. Burnett & Beaver Dam Farmers' Mut. Fire Ins. Co.*, 74 N.W. 131, 132 (Wis. 1898)). "[A] court's primary purpose in interpreting a contract for insurance is to give effect to the intentions of the parties", which are usually "presumed to be expressed in the language of the policy." *Wadzinski*, 818 N.W.2d at 824 (citing *Folkman v. Quamme*, 665 N.W.2d 857, 864 (Wis. 2003)). But, in some cases, extrinsic evidence, such as the "parties' testimony and drafts of the contract", is properly presented to and used by "the jury to resolve factual disputes about contract formation", including questions of fact about "the parties' respective understandings at the time they entered into a contract". *Fontana Builders*, 882 N.W.2d at 409–11 (citing *Pleasure Time, Inc. v. Kuss*, 254 N.W.2d 463 (Wis. 1977); *Cent. Auto Co. v. Reichert*, 273 N.W.2d 360 (Wis. Ct. App. 1978)).

III

A

West Bend's and Zenith's conflicting readings of the bond show that its provisions are ambiguous as written and as applied to the underlying facts. West Bend argues that the bond *would have* insured performance of the December 12, 2018 draft subcontract between Cornerstone and Zenith *if* they had executed that subcontract. After all, West Bend says, the bond's cover page clearly refers to a "construction contract" dated "12/12/2018". ECF No. 71-11, at 1. But Cornerstone and Zenith did not execute that draft subcontract—they executed a revised subcontract dated February 14, 2019—and West Bend did not issue another bond. Accordingly, West Bend asserts, it cannot be liable for any failure to perform under the executed subcontract.

West Bend's argument has some initial textual appeal, but the contrary argument is not easily dismissed. The bond states that it insures "the performance of the Construction Contract". *Id.* at 2. It defines the term "Construction Contract" as "[t]he agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents." *Id.* at 3. The bond's cover page respectively identifies the "Owner" and "Contractor" as "Zenith Tech, Inc." and "Cornerstone Pavers, LLC". *Id.* at 1. And the bond defines the term "Contract Documents" as "[a]ll the documents that compromise the agreement between the Owner and Contractor." *Id.* at 3. The use of the definite article in "the agreement" suggests that there is only one relevant agreement between the "Owner" and the "Contractor". And, in fact, there is only one such agreement between Zenith and Cornerstone, identified by the date of a draft of that agreement (December 12, 2018) that was then changed and executed with a different date (February 14, 2019) but with the same price, for the same project.

Accordingly, under one reasonable construction of the bond, it insures only performance of a contract with the date listed on its cover page (December 12, 2018), but

under another reasonable construction of the bond, that contract date is merely one of several identifiers of "the agreement" that Zenith and Cornerstone executed, in the form of a subcontract dated February 14, 2019, which was arguably nothing more than the December 12, 2018 draft agreement "and changes made to" that draft agreement.

B

West Bend argues that a boilerplate provision in the executed subcontract obviates this latter reading. The February 14, 2019 subcontract states, in relevant part,

> This Agreement and the documents designated herein constitute the entire agreement between Contractor and Subcontractor with respect to the subject matter of this Agreement and cannot be amended, modified, or changed except in writing, executed by Contractor and Subcontractor. This Agreement shall supersede any and all other agreements, representations, earlier proposals, bids and quotations, between Contractor and Subcontractor, either written or verbal with respect to the subject matter hereof.

ECF No. 55-2, at 28. But under either reading, the bond seems to incorporate the December 12, 2018 draft subcontract—the "Construction Contract"—not the February 14, 2019 executed subcontract. See ECF No. 71-11, at 2 ("[T]he Construction Contract . . . is incorporated herein by reference."). And even if the December 12, 2018 draft subcontract contains the same boilerplate provision as that quoted above (from the February 14, 2019 executed subcontract)—which is not clearly a part of that draft agreement, based on the filed exhibit containing it, see ECF No. 71-8—the draft agreement was "changed . . . in writing" and "executed by Contractor and Subcontractor" with the February 14, 2019 date, so that language in the draft agreement does not obviously make the executed subcontract a document comprising part of a *different* agreement between Zenith and Cornerstone, for purposes of the bond.

West Bend also argues that the execution of the February 14, 2019 subcontract released it from its obligations under the bond because it was a "novation" of the December 12, 2018 draft subcontract. As a matter of pure semantics, this is nonsense.

"Novation" refers to "[t]he act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party." *Black's Law Dictionary* (11th ed. 2019), Westlaw. The December 12, 2018 draft subcontract did not *establish* any obligations because it was not *executed*, so the February 14, 2019 executed subcontract did not *substitute* any new obligations for any existing ones, meaning it was not a "novation".

C

The parties present and rely upon extrinsic evidence to resolve the ambiguity in the bond's coverage. For example, West Bend relies on the deposition testimony of Jason Enders, its Director of Underwriting for Bonds, who explained that, while West Bend *does* issue bonds based on unexecuted, draft agreements, it does so *only* with the understanding that either the agreement is final pending its execution by the parties—meaning that the bond applies to the agreement once the parties execute it—*or* that further changes to the agreement before execution render the bond invalid as issued such that West Bend will have to reissue the bond for the final agreement. See ECF No. 72-5, at 9–11. Neither happened here—the parties did not execute the December 12, 2018 draft subcontract and West Bend did not reissue the bond for the February 14, 2019 executed subcontract—so, West Bend contends, the bond does not apply.

In response, Zenith cites an affidavit and emails provided by Cornerstone's sole member, Christopher Cape, including an exchange, within a week after the subcontract was executed, in which a representative of Zenith asked for a bond, Cape provided the December 12, 2018 bond, and Zenith's representative replied, "Looks good!" ECF No. 55-9, at 5, ¶¶15–16. Minimally, this exchange suggests that Cornerstone, the other party to the bond, understood that, although the bond was previously issued and referred to an earlier draft subcontract that was never executed, it covered the later-executed subcontract, all the same. It also suggests that Zenith, another entity in the relevant business, understood it the same way.

The parties both present evidence of what they did (or did not do) after the bond was issued, but it does not clearly validate (or invalidate) either side's reading of the bond. For example, West Bend repeatedly emphasizes that no one ever gave it a copy of the final, executed subcontract—so it was not aware of that subcontract for months—and that, if somebody had done that, it would have reissued the bond, as is its practice. For its part, Zenith insists that West Bend issued the bond knowing full well that the subcontract had not yet been executed—so it clearly indicated its understanding that the terms of the subcontract might change and accepted the risk that they would—and that West Bend never *asked for* a copy of the executed subcontract, despite only having received an unexecuted draft of the agreement. Moreover, the record makes clear that when Zenith first made a demand on the bond (or suggested that it might), West Bend denied liability based on Zenith's apparent failure to provide proper notice of Cornerstone's termination and a reasonable opportunity for West Bend to identify a replacement subcontractor, *not* because the bond did not apply to the subcontract.[1]

West Bend and Zenith's presentation of and reliance on extrinsic evidence about the understanding of the bond's parties when the bond was issued to resolve ambiguities in the bond's coverage clearly indicate genuine disputes of fact that must be resolved by a factfinder, unless the disputed facts are immaterial because West Bend is entitled to judgment as a matter of law, notwithstanding those disputes. Whether that is the case depends on whether West Bend is correct that Zenith failed to satisfy the conditions precedent to West Bend's obligations under the bond.

---

[1] Indeed, nothing in the record suggests that anyone understood the bond to not apply to the executed subcontract at all *until* West Bend's attorneys raised that issue in this proceeding. That does not, of course, mean that reading should be disregarded out of hand—as mentioned above, that reading has a certain textual appeal—but it does cut against any reasonable inference that *any* of the parties to the bond, including West Bend, sincerely understood it, when it was issued, the way that West Bend now says it should be read. That West Bend's attorney, during oral argument, blanched at the court's suggestion that West Bend ought to refund the substantial premium for its issuance of the bond, as a paid surety, if the bond, due to the circumstances, never insured *anything*, further suggests that this proposed reading represents litigation strategy and not the genuine understanding of a party to the bond, at its issuance.

IV

West Bend and Zenith present conflicting readings of the conditions that the bond says must be satisfied before West Bend's obligations under it arise. Section 3 of the bond states, "If there is no Owner Default under the Construction Contract, the Surety's obligation under this bond shall arise after" three specified conditions are satisfied. ECF No. 71-11, at 2. Section 4 of the bond makes clear that the failure to satisfy the first of these three conditions—which requires the "Owner" to give the "Contractor" and the "Surety" notice that it "is considering declaring a Contractor Default" and specifies a procedure for addressing and attempting to resolve the relevant issues of the "Owner" with "the Contractor's performance"—"shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice." *Id.* Zenith concedes that it did not satisfy this condition, but West Bend also concedes that Zenith's failure to do so does not, under the circumstances, release it from its obligations under the bond. Zenith and West Bend instead focus, as does this opinion, on the latter two conditions listed in section 3.

Ignoring, for the moment, the first of the listed conditions, section 3 of the bond states:

> **§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after
>
> . . .
>
> **.2** the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and
>
> **.3** the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

*Id.* Zenith clearly declared a "Contractor Default", terminated the "Construction

Contract", and notified West Bend. And Zenith seems to have agreed to pay the "Balance of the Contract Price" according to the terms of the "Construction Contract" to the replacement subcontractor that *it* selected to perform the "Construction Contract." Thus, as a strictly textual matter, it appears that Zenith satisfied the conditions precedent to West Bend's obligations under the bond and the dispute must proceed to a trial to determine the extent of West Bend's liability under the bond, if any.

West Bend reads the bond differently, however, asserting that, when read in context, the conditions precedent to its obligations under the bond were never satisfied. Specifically, West Bend argues that section 3.2 of the bond entitled it to *timely* notice (which is to say, *advance* notice) by Zenith of its termination of the "Construction Contract" and that section 3.3 of the bond entitled West Bend to a reasonable opportunity to select a replacement subcontractor to perform the "Construction Contract". West Bend's contextual argument rests on sections 5 & 6 of the bond, which require the "Surety" to "promptly and at the Surety's expense take one of the . . . actions" listed, including soliciting bids and negotiating proposals from potential replacement subcontractors, while clearly permitting the "Surety" to decline to act and simply pay "the amount for which it may be liable to the Owner" or "[d]eny liability in whole or in part", and provide the "Owner" with a procedure by which it may demand that "the Surety perform its obligations under this Bond". *Id.* West Bend insists that Zenith's admitted failure to give it advance notice and an opportunity to exercise or waive its "right" to act under the bond, including its "right" to hire a replacement subcontractor of its own, amounts to a failure by Zenith to satisfy one or more conditions precedent to West Bend's obligations under the bond.

West Bend's reading of these provisions has some intuitive appeal, as the bond seems to have been written to afford West Bend, as the "Surety", the ability to participate meaningfully in charting a forward course upon the termination of the original, bonded subcontractor. But this reading does not withstand scrutiny. The bond

says that West Bend is *obligated* to take one of the actions listed in its section 5 but *only* "[w]hen the Owner has satisfied the conditions of Section 3", i.e., the conditions precedent to West Bend's obligations under the bond. *Id.* In other words, West Bend's argument is that an implied condition *precedent* to its obligations under the bond is a reasonable opportunity to fulfill those obligations *after* they arise. A bond could certainly be written to release the surety from any obligation under it if, for example, the "Owner", by its unilateral action, denies the surety a reasonable opportunity to act in certain ways, but the bond at issue here says no such thing. Thus, whatever high-level appeal West Bend's proposed contextual reading may have, it clearly fails as a textual matter.

West Bend's reading of section 3.2 of the bond to require advance notice of the termination of the covered contract largely rests on precedent that does not clearly apply here, namely *State Bank of Viroqua v. Capital Indemnity Corp.*, 214 N.W.2d 42 (Wis. 1974). At issue in that case was a bond stating, "At the earliest practicable moment after discover of any loss hereunder the Insured shall give the underwriter written notice thereof . . . ." *Id.* at 43–44. The court described various rules applied by other courts "[i]n construing the effect of a provision in a fidelity bond or policy calling for notice of loss *within a prescribed period of time* (such as 'at the earliest practicable moment after discovery of a loss')" before adopting "the majority rule", which treats such a "notice of loss provision as a condition precedent even though the contract does not expressly say so or contain a forfeiture clause", meaning "that noncompliance will defeat recovery on the bond." *Id.* at 45 (emphasis added). As the court explained, "The rationale behind the majority rule is to give the earliest opportunity to the surety to investigate, minimize and recoup losses while the time is ripe for such purposes, and to give the surety a reasonable opportunity to protect its rights." *Id.*

The court's decision rests on a broader legal principle, however: "a contract means what it says" even if it is not "phrased in 'terms of art'". *Id.* at 46. The same is

true of section 3.2 of the bond at issue here, which does *not* require notice *within a prescribed period of time*, much less *advance* notice of anything. To the contrary, its structure suggests what it clearly says: as "a condition precedent to the Surety's obligations," section 3.2 is satisfied if "the Owner" first "declares a Contractor Default", *then* "terminates the Construction Contract", and only *then* "notifies the Surety". ECF No. 71-11, at 2.[2] That is what happened here. And neither *State Bank of Viroqua* nor its rationale, however persuasive, justifies rewriting the bond at issue here to give West Bend the benefit of opportunities for which it did not bargain.

West Bend also explains that "courts in many other jurisdictions" construing performance bonds purportedly in the same form as the bond at issue here—the "AIA 312 Performance Bond"—have found "that the provisions of Section 3 regarding notice constitute conditions precedents [sic] to surety liability". ECF No. 55, at 16. Following this assertion is a string of citations to cases from some federal courts (and one state court) that involved performance bonds. This caselaw is not particularly helpful: section 3 of the bond clearly sets forth conditions precedent to the obligations of the "Surety" under the bond, and nobody here is arguing otherwise. See, e.g., *120 Greenwich Dev. Assocs., LLC v. Reliance Ins. Co.*, No. 01 CIV 8219, 2004 WL 1277998, at *12 (S.D.N.Y. June 8, 2004) (concluding that "Paragraph 3 of the Bond . . . . creates unambiguous preconditions for triggering" the surety's "obligations under the Bond").

To the extent this caselaw has anything else to say about the issues presented here, it is not particularly persuasive. In part this is because the bond at issue here is

---

[2] Section 3.1 of the bond requires advance notice "that the Owner is considering declaring a Contractor Default" and further requires that the "Surety" must request a conference with the "Owner" and "Contractor" within a prescribed period of time after receiving such notice (if it wishes to do so) and that, if it does, the requested conference must then be held within a prescribed period of time. ECF No. 71-11, at 2. As noted above, however, Zenith's noncompliance with section 3.1 does not release West Bend from its obligations under the bond unless West Bend demonstrates "actual prejudice", a showing for which it does not argue on summary judgment. *Id.* The specificity of section 3.1 weighs against reading any similarly exacting notice requirement into section 3.2, which is, by comparison, much more simply stated.

based on what appears to be a newer version of the form on which the bonds at issue in the cases cited are based, and the older version of that form differs from the relevant version in two substantial ways: First, the older version of the bond form does *not* limit the extent to which noncompliance with section 3.1 constitutes a failure to satisfy a condition precedent to the obligations of the surety. See, e.g., *Solai & Cameron, Inc. v. Plainfield Community Consolidated School District No. 202*, 871 N.E.2d 944, 947 (Ill. App. Ct. 2007). Second, the older version of the bond form *does* provide that the "Owner" cannot "declare[] a Contractor Default" under section 3.2 "and formally terminate[] the Contractor's right to complete the contract" until at least "twenty days after the Contractor and the Surety have received notice" under section 3.1 "that the owner is considering declaring a Contractor Default". See, e.g., *Seaboard Sur. Co. v. Town of Greenfield ex rel. Greenfield Middle Sch. Bldg. Comm.*, 370 F.3d 215, 216 (1st Cir. 2004). In other words, the bonds at issue in the cases cited by West Bend, like the bond at issue in *State Bank of Viroqua*, but unlike the bond at issue here, expressly require and *prescribe periods of time* for notice.

      Furthermore, the cases that West Bend cites seem to turn, in whole or substantial part, on issues that the parties have not raised. Some chiefly concern the failure of the "Owner" to declare a "Contractor Default", either properly (according to the terms of the subcontract incorporated into the bond) or at all. See, e.g., *Stonington Water St. Assoc., LLC v. Hodess Bldg. Co.*, 792 F. Supp. 2d 253, 263–64 (D. Conn. 2011) (concluding that "the underlying construction contract" was not "properly terminated . . . as required by section 3.2"); *Enter. Cap., Inc. v. San-Gra Corp.*, 284 F. Supp. 2d 166, 179 (D. Mass. 2003) (concluding that the original subcontractor "was never adequately terminated" for purposes of section 3.2 of the bond); *Balfour Beatty Const., Inc. v. Colonial Ornamental Iron Works, Inc.*, 986 F. Supp. 82, 86 (D. Conn. 1997) (concluding that "the plaintiff did not declare the principal to be in default"). Others are primarily resolved on the legal principle that a material breach of a contract by one party relieves the other

party of any further obligations under the contract. See, e.g., *Seaboard Sur. Co.*, 370 F.3d at 216–17 & 219–20 (concluding that noncompliance with the notice requirement of a bond provision deeming "the Surety . . . to be in default . . . fifteen days after receipt of a[] . . . written notice from the Owner to the Surety demanding that the Surety perform its obligations under th[e] Bond" is "a material breach of the bond", relieving the surety of liability thereunder); *Solai & Cameron, Inc.*, 871 N.E.2d at 956 (quoting *Dragon Const., Inc. v. Parkway Bank & Tr.*, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997)) (concluding that, by hiring a replacement subcontractor "first and thereafter declaring a subcontractor default and termination", a general contractor "negated" the surety's "options under . . . the performance bond", which "violated the terms of the performance bond and nullified" the surety's "duty to perform"); see also *Elm Haven Const. Ltd. P'ship v. Neri Const. LLC*, 376 F.3d 96, 101 (2d Cir. 2004) (concluding that a surety was "excus[ed] . . . from its performance" under a bond because the general contractor "hired a replacement subcontractor five weeks before declaring [the original subcontractor's] default . . . and incurred further payment obligations in hiring replacement subcontractors before actually defaulting [the original subcontractor]").

West Bend's clearly articulated position from the jump is that Zenith did not satisfy the conditions precedent to its obligations under the bond, *not* that, despite those conditions being satisfied, Zenith materially breached the bond's terms, thereby excusing West Bend from any further obligations (and liability) under the bond. West Bend only ever makes the latter argument, or does so with anything approaching clarity, in its reply brief. See ECF No. 72, at 2 ("The actions of Zenith Tech constitute a prior material breach of the bond that stripped the surety of its rights under the bond and which under the law discharge the surety from liability."). That is too little, too late. See *Connelly v. Cook Cnty. Assessor's Off.*, No. 19-CV-07894, 2022 WL 294764, at *1 n.1 (N.D. Ill. Feb. 1, 2022) (citing *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021); *Chicago Joe's Tea Room, LLC v. Village of Broadview*, 894 F.3d 807, 817 (7th Cir. 2018))

("Cursory arguments made in footnotes and arguments made for the first time in reply briefs are waived."). A string of citations with vaguely stated parentheticals—the most that West Bend's principal brief offers in support of a material-breach argument—is insufficient to properly raise an issue on a motion for summary judgment.

What is more, the summary-judgment record does not, as a matter of law, establish that Zenith materially breached the bond and thereby excused West Bend from its obligation to perform or its liability under the bond's terms. Under Wisconsin law, "[f]or a breach to be material, it must be so serious as to destroy the essential object of the agreement." *Ranes v. Am. Fam. Mut. Ins. Co.*, 580 N.W.2d 197, 200 (Wis. 1998) (citing *Appleton State Bank v. Lee*, 148 N.W.2d 1, 3 (Wis. 1967)). "When the breach is 'relatively minor' and not 'of the essence,' the nonbreaching party is not excused from performance." *Id.* (quoting *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996)). But "even where such a material breach has occurred, the non-breaching party may waive the claim of materiality through its actions." *Mgmt. Computer Servs., Inc.*, 557 N.W.2d at 78 (citing *Entzminger v. Ford Motor Co.*, 177 N.W.2d 899, 901 (Wis. 1970)). Importantly, "whether a party's breach excuses future performance of the contract by the non-breaching party presents a question of fact." *Id.* (citing *Shy v. Indus. Salvage Material Co.*, 58 N.W.2d 452, 456 (Wis. 1953)).

West Bend argues—though, again, only in its reply brief—that a general contractor's hiring of a replacement subcontractor without first notifying the surety of the termination of the original subcontractor is, without more, a material breach of the bond that "discharges the surety from liability" because it "strips the surety of its rights". See ECF No. 72, at 9–10 (citing *Elm Haven Const.*, 376 F.3d 96; *Enter. Cap., Inc.*, 284 F. Supp. 2d 166); see also *W. Sur. Co. v. U.S. Eng'g Constr., LLC*, 955 F.3d 100, 106 (D.C. Cir. 2020) (noting that "robb[ing]" a surety "of its contractually agreed-upon opportunity to participate in the mitigation process entirely. . . . seem[s] . . . inherently prejudicial"). Whether other courts applying the substantive law of other jurisdictions

have taken that approach (including equating materiality and prejudice), it is clearly at odds with Wisconsin law, as it ignores the case-specific nature of the "materiality" inquiry (and any "waiver" inquiry that might follow) described in the relevant cases. Under Wisconsin law, materiality and waiver are issues of fact, and West Bend has not shown that the evidence is such that it is entitled to judgment as a matter of law because no reasonable factfinder could side with Zenith on those issues. Cf. *Entzminger*, 177 N.W.2d at 901 ("The jury could believe that Ford did not consider these breaches very important or material as Ford allowed them to exist and the plaintiff to struggle along for some years before refusing to perform its part of the contract. If the breaches were material, such delay waived the materiality.").

With respect to whether Zenith failed to satisfy a condition precedent to West Bend's obligations under the bond, however, there are no genuine disputes of material fact, and to any extent that the relevant language of the bond can be said to be ambiguous, it must be construed, as a matter of law, against West Bend. Accordingly, the bond is construed consistent with Zenith's reading, and under that reading, the conditions precedent to West Bend's obligations under the bond *were* satisfied.

V

For the foregoing reasons, West Bend's motion for summary judgment is denied.

#####