So Ordered.

Dated: September 7, 2023



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Cornerstone Pavers, LLC,             Case No. 20-20882-gmh

                                    Chapter 11

         Debtor.

Cornerstone Pavers, LLC,

         Plaintiff,

      v.                           Adv. Proc. No. 21-02044-gmh

      Zenith Tech Inc.,

         Defendant.

**OPINION AND ORDER ON (1) CORNERSTONE PAVERS, LLC'S MOTION FOR SUMMARY JUDGMENT AND (2) WEST BEND MUTUAL INSURANCE COMPANY'S SECOND MOTION FOR SUMMARY JUDGMENT**

       After Zenith Tech Inc. was hired by the Wisconsin Department of Transportation (DOT) to complete a highway-construction project, it subcontracted with Cornerstone

Pavers, LLC, to perform some of the work. Before the subcontracted work was completed, Zenith terminated Cornerstone and replaced it with another subcontractor. Cornerstone later commenced the underlying bankruptcy case and this adversary proceeding, seeking to recover damages from Zenith for breach of the subcontract and the duty of good faith and fair dealing. Zenith counterclaimed on the same grounds.

Zenith also seeks to recover from West Bend Mutual Insurance Company on a bond that West Bend allegedly issued to insure the performance of the subcontract (whether by Cornerstone or, as Zenith maintains became necessary here, by someone else). West Bend denies all liability under the bond. West Bend sought summary judgment against Zenith, and the court denied that motion more than a year ago, concluding that West Bend had failed to show that it was entitled to judgment as a matter of law on any of the stated grounds, based on the uncontested facts.

Cornerstone now moves for summary judgment against Zenith, asserting that Zenith materially breached the subcontract when it terminated Cornerstone without giving it notice of default and a full opportunity to cure. And West Bend moves for summary judgment against Zenith for a second time, similarly asserting that Zenith's failure to comply with certain notice requirements of the bond was either a material breach of the bond's term or otherwise released West Bend from its obligations under the bond. For the following reasons, both motions for summary judgment are denied.

I

The same, familiar standard applies to both Cornerstone's and West Bend's motions for summary judgment against Zenith. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Fed. R. Bankr. P. 7056 ("Rule 56 F.R.Civ.P. applies in adversary proceedings . . . ."). Under this standard, a fact is material if a dispute about it "might affect the outcome of the suit under the governing law". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a

factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

II

Cornerstone argues that, based on uncontested facts, it is entitled to judgment as a matter of law because Zenith materially breached the subcontract when it terminated Cornerstone and hired another subcontractor to complete the work. In support of this argument, Cornerstone points to an exchange of emails that occurred around the time Zenith terminated Cornerstone in July 2019. Zenith responds that the parties' emails at most show that there are genuine issues of material fact as to whether it terminated Cornerstone in compliance with the subcontract.

A

The senders and main recipients of the correspondence in question were Chad Shihata of Zenith, Chris Cape of Cornerstone, and Charles Krummel of the DOT. For the sake of clarity, this opinion refers to these individuals by their respective institutions, rather than by their names.

On Thursday, July 18, 2019, the DOT sent Zenith an email, to which the DOT attached a "letter noting . . . numerous concrete pavement and concrete ancillary deficiencies on the project." ECF No. 133-4, at 5. The DOT's letter lists fourteen such "deficiencies caused by . . . Cornerstone", including "[f]requent equipment breakdowns", "[t]wo separate instances . . . while slip-form paving in which the concrete pavement was installed poorly enough that removal and replacement were completed", and "[p]avement installed approximately 2" to 3" higher than plan grades". *Id.* at 6. The letter states that "[t]he issues are affecting [the] schedule" for the project and that the DOT is "not certain what partnering initiatives the department can offer to

advance [the] schedule and lesson [sic] the assessment of liquidated damages . . . [i]f the . . . [listed] deficiencies continue." *Id.* The letter concludes, "Per standard specification 105.3.2.2 this is Unacceptable Work. Please have your contractor correct these issues immediately to avoid future engineer ordered suspensions of work and an order to completely remove and replace the work that is unacceptable." *Id.* at 7.

Later the same day, Zenith sent an email directing Cornerstone to "[s]ee the attached letter received . . . from DOT." *Id.* at 4. Zenith's email then lists eight "locations" where "the department" had requested that concrete work by Cornerstone "be removed and replaced", noting that "[p]roject staff has photos of deficiencies justifying the request" and detailing the issues with the work at each listed location. *Id.* Zenith's letter concludes, "As there are major concerns that conforming material/work can be performed, Zenith Tech is directing you to correct your work immediately under section 3.4 of subcontract agreement, Correction of Work, before commencing with further placement of concrete." *Id.* at 5.

The following day, Zenith emailed Cornerstone again "to address . . . issues" related to the "subcontract agreement" that had apparently arisen during discussions earlier that day. *Id.* at 2. That email cites specific provisions of the subcontract—namely, sections 3.4, 12.1, 12.2, and 23.1—and describes how, in Zenith's view, each applied with respect to the previously identified deficiencies in Cornerstone's work. The email then notes that, since Zenith's email previous day, Cornerstone had "proceeded with placement of concrete . . . after being directed not to", "made marginal attempt to begin removal operations as directed", "focused . . . on preparing for placement of concrete on Monday", and "contacted various parties . . . in an attempt to be relieved of direction provided." *Id.* at 3. The email then states that, following a discussion with the DOT and to avoid a "potential . . . suspension of work" due to "concerns" described by the DOT to Cornerstone at a meeting that day, Zenith "committed to removing deficient pavement and curb placed." *Id.* The email concludes, in relevant part:

Again, for reasons listed below and above, you will not proceed with any placement of concrete until you have removed all concrete outlined by the DOT and directed by both DOT and [Zenith]. You will perform this work vigorously until complete and resume concrete placement as directed by [Zenith] per [sections] 3.3 and 23.1 [of the subcontract]."

*Id.*

Exactly 24 hours later (on Saturday, July 20, 2019), Cornerstone sent Zenith an email describing Cornerstone's understanding of what the DOT had said at a meeting earlier that week, what Cornerstone had said in response, and what Cornerstone had since "learned". *Id.* at 1. That email concludes with an objection to Zenith's demand for the removal and replacement of certain work by Cornerstone, citing an apparent reasonableness requirement in section 3.4 of the subcontract ("Correction of Work"):

Removal and replacement is not <u>reasonable</u> given no standard has been provided that the pavement violates[;] there is no standard that disallows the placement of thicker pavement than planned given all drainage, safety, and ADA requirements are maintained. No standard for correction has been provided to Cornerstone likely due to the fact the pavement is not out of tolerance and in fact is at the same approximate slope of the preexisting pavement and according to WisDOT is at the same slope as other new pavement on the project.

Cornerstone is respectfully objecting to your direction to remove and replace the pavement in question and asks you to reconsider your position or we request to appeal your decision . . . . If Cornerstone is not allowed to appeal your decision, Cornerstone fully holds Zenith Tech accountable and will bill Zenith Tech for all costs and other damages related to its improper direction.

*Id.*

On Monday, July 22, 2019, Zenith sent Cornerstone a letter terminating the subcontract. The termination letter invokes section 3.3 of the subcontract ("Failure to Perform"), explains that Cornerstone breached the subcontract by "fail[ing] to perform its obligations [under] the Subcontract vigorously or . . . at all", and lists seven

"reasons" why, "[f]rom the beginning of this Project, Cornerstone's performance" was "unsatisfactory at best . . . , including but not limited to" that Cornerstone insisted on "debating non-issues", failed "to show any sense of urgency . . . to meet the project schedule", and did not "removed defective work pursuant to section 3.4" as directed. ECF No. 133-5, at 1. The termination letter also cites section 23.2 of the subcontract as authority for Zenith "taking over ownership of materials . . . on-site and . . . yet to be delivered" and "invoke[s] its right under Subcontract [section] 4.11 to pay for materials either by joint check or directly." *Id.* at 1–2.

B

Cornerstone argues that it is entitled to judgment against Zenith as a matter of law because the record makes clear—i.e., Zenith cannot and does not genuinely dispute—that Zenith terminated the subcontract without giving Cornerstone proper notice of default and a full opportunity to cure as the subcontract required.

1

Cornerstone asserts that the sole source of Zenith's authority to terminate the subcontract was section 23.2 of the subcontract, which provides, in relevant part, "Contractor [i.e., Zenith] may terminate this Agreement for cause if Subcontractor [i.e., Cornerstone] fails to cure a default within three (3) days of Contractor's written notice of the default to Subcontractor." ECF No. 133-3, at 11. Cornerstone argues that Zenith's July 18 email cannot be read as a written notice of default for purposes of section 23.2 of the subcontract. According to Cornerstone, that email can only reasonably be read as a demand, under section 3.4 of the subcontract, that Cornerstone correct certain work, and a suspension of Cornerstone's other work pending those corrections, as permitted by section 23.1 of the subcontract. See ECF No. 133, at 5 ("Nothing in [Zenith's July 18 and 19] communications declares Cornerstone in default of the Subcontract Agreement or notifies Cornerstone that Z[enith] intends to terminate the Subcontract Agreement.").

Zenith disagrees, asserting that it "provided written notice of Cornerstone's default in the form of a demand to correct defective work on July 18, 2019, and Cornerstone failed to timely cure its default by removing and replacing all 'improper or defective Work' by Monday, July 22, 2019." ECF No. 136, at 2 (footnote omitted). In other words, Zenith contends that its July 18 email *was* a written notice of default under section 23.2 of the subcontract and Cornerstone's failure to cure the identified defaults within the allotted three-day period permitted Zenith's termination of the subcontract.

Zenith also argues that its termination of the subcontract was proper under section 3.4 of the subcontract, which reads in relevant part as follows:

> <u>Correction of Work</u>: In the event that any part of the Work or any material is determined by Contractor . . . to be improper or defective during the actual performance of the Work, Subcontractor shall, at its expense, repair and/or replace, at Contractor's reasonable option, improper or defective Work and any damages caused thereby within three (3) days of Contractor's demand to correct the same. If Subcontractor fails to comply with its obligations under the Contract Documents, and the failure is not corrected within three (3) days after Contractor's demand, then Contractor may, without prejudice to any other right or remedy it may have, either terminate this Agreement for cause and take over and complete the Work at the expense of Subcontractor, or without terminating this Agreement, take over the Work or any portion thereof and cure such default. . . .

ECF No. 133-3, at 6. Zenith emphasizes that its July 18 email identified numerous instances of Cornerstone's work that the DOT and Zenith had determined to be improper or defective. And that email ends with a clear invocation of section 3.4 of the subcontract. See ECF No. 133-4, at 5. Because "Cornerstone . . . fail[ed] to correct [the] Work and cure the default at least three days after Z[enith] demanded corrections", Zenith asserts, it "properly terminated Cornerstone for cause" under section 3.4 of the subcontract. ECF No. 136, at 7.

Finally, Zenith argues that its termination of the subcontract was proper under section 3.3 of the subcontract, which reads in relevant part as follows:

      <u>Failure to Perform</u>: . . . [I]f Subcontractor does not prosecute the Work vigorously, as reasonably determined by Contractor, Contractor will take over the Work and complete it, either by performing the Work itself or re-letting all or any part of the Work. . . .

ECF No. 133-3, at 5. Zenith contends that Cornerstone "fail[ed] to vigorously correct [the] Work" identified by Zenith and the DOT on July 18, so it "was within its rights to terminate Cornerstone" under section 3.3 of the subcontract. ECF No. 136, at 11.

      In reply, Cornerstone acknowledges that Zenith's July 18 demand to correct "claimed deficiencies in Cornerstone's work" was permitted by section 3.4, and Cornerstone does not suggest that it can show as a matter of law that it timely made the requested corrections. See ECF No. 141, at 3 & 5. It instead argues that because Zenith's July 18 notice referred only to section 3.4 of the subcontract, Zenith impermissibly relied on section 3.3 of the subcontract as the basis for termination in its July 22 letter. See *id.* at 4. Cornerstone argues, in the alternative, that if Zenith is entitled to defend the propriety of its termination based on section 3.4 of the subcontract, the court should prohibit Zenith from doing so at trial on any grounds other than the alleged deficiencies in Cornerstone's work listed in its July 18 email. *Id.* at 5–6.

2

      The record does not allow the court to conclude, based on the undisputed facts, that Zenith improperly terminated the subcontract. There are several reasons for this.

      First, even if Zenith's termination letter is construed such that only section 3.3 of the subcontract may be invoked to justify its termination of Cornerstone, the record does not foreclose Zenith's ability to make that showing. Section 3.3 permits "Contractor" to "take over the Work and complete it, either by performing the Work itself or re-letting all or any part of the Work", "if Subcontractor does not prosecute the Work vigorously, as reasonably determined by Contractor". ECF No. 133-3, at 5. The termination letter, citing section 3.3, states that "Cornerstone . . . failed to perform its

obligations [under] the Subcontract vigorously". ECF No. 133-5, at 1. And there seems to be no dispute that Zenith, having determined that Cornerstone had so failed, "re-let[] all . . . of the Work", as section 3.3 allows. ECF No. 133-3, at 5. Whether Zenith "*reasonably* determined" that Cornerstone did not "prosecute the Work vigorously" is another matter. *Id.* (emphasis added). But that is a matter for trial, as the record before the court does not foreclose the possibility that Zenith's determination was reasonable, or that it could prove at trial that it was. Moreover, section 3.3 may well have allowed Zenith to terminate the contract—i.e., "take over the Work"—without any notice to Cornerstone. ECF No. 133-3, at 5.

Second, even if one reads the subcontract such that Zenith could only terminate it by complying with section 23.2, genuine disputes of material fact remain as to whether Zenith did so. Section 23.2, as noted above, provides that "Contractor may terminate this Agreement for cause if Subcontractor fails to cure a default within three (3) days of Contractor's written notice of the default to the Subcontractor." ECF No. 133-3, at 11. Although Cornerstone argues that Zenith's July 18 email was only a demand to correct work under section 3.4 of the subcontract, that communication can reasonably be construed as also providing written notice of default for purposes of section 23.2. The July 18 email begins by directing Cornerstone to the DOT's July 18 letter to Zenith, a copy of which was attached to that email. Again, the DOT letter begins, "The department has noted numerous concrete pavement and concrete ancillary deficiencies caused by your sub-contractor, Cornerstone Pavers, LLC." ECF No. 133-4, at 6. It continues, "The issues are affecting your schedule. . . . [W]e are not certain what partnering initiatives the department can offer to advance your schedule and less[e]n the assessment of liquidated damages past the completion date . . . if the following deficiencies continue." *Id.* "[T]he following" is a fourteen-item list of purported deficiencies, after which the letter states, "Per standard 105.3.2.2 this is Unacceptable Work. Please have your contractor correct these issues immediately to avoid future

engineer ordered suspensions of work and an order to completely remove and replace the work that is unacceptable." *Id.* at 6–7. Cornerstone has not shown that Zenith's July 18 email cannot reasonably be construed as written notice, pursuant to section 23.2, of the deficiencies listed in the DOT's letter, as well as those specified in the email itself, to which the DOT's letter was attached. And the second sentence of Zenith's email, describing confirmation from the DOT that the identified work would "need to be removed and replaced", can reasonably be read to mean that the email's list of locations where Cornerstone was directed to remove and replace work was provided "to avoid future engineer ordered suspensions of work and an order to completely remove and replace the work that is unacceptable", not to excuse other deficiencies listed by the DOT, such as "[f]requent equipment breakdowns" and "[i]nconsistent and slow delivery of ready-mix concrete during slip-form paving operations forcing start and stop situations of the paving machine". *Id.* at 4 & 6–7. Cornerstone has not shown that these alleged deficiencies could not reasonably be found to constitute defaults under section 23.2 of the subcontract or, for that matter, failures to prosecute the work vigorously under section 3.3.

Third, even if one were to construe Zenith's July 18 email as a notice of only the issues specifically listed in the email's text, Cornerstone still has not shown that the record forecloses a reasonable finding at trial that Zenith permissibly terminated the contract on July 22. Section 3.4 of the subcontract, quoted above, required Cornerstone to "repair and/or replace" any "improper or defective Work and any damages caused thereby within three (3) days of [Zenith's] demand to correct same." ECF No. 133-3, at 6. That section further provides that upon Cornerstone's failure to correct that work within that period, Zenith could, "without prejudice to any other right or remedy it may have [had], . . . terminate [the] Agreement". *Id.* Again, Cornerstone does not contend that the record establishes that it corrected all of the defects identified in the July 18 email within three days (or at all, since it was terminated on the fourth day). It

instead argues that Zenith cannot justify termination under section 3.4 because its termination letter cites sections 3.3 and 23.2. But Cornerstone points to nothing in the subcontract, the parties' course of dealing, or any other possible evidence that forecloses the conclusion that termination under section 3.4 constitutes a breach if the termination letter refers to section 3.3, rather than 3.4. (And this argument, of course, ignores that the termination letter *does* cite section 3.4, specifically describing Cornerstone's failure "to remove defective work pursuant to section 3.4" as one of the reasons that "Cornerstone's performance" was "unsatisfactory as best". ECF No. 133-5, at 1.) Regardless, nothing in the contract or elsewhere in the summary judgment record establishes, as a matter of law, that a failure to timely correct an identified defect under section 3.4 cannot also amount to a failure to "prosecute the Work vigorously", thus grounds for Zenith to terminate the subcontract under section 3.3.

For all of these reasons, Cornerstone has not established the absence of all genuine disputes of material fact with respect to whether Zenith properly terminated the subcontract on July 22, 2019.[1] Nor has Cornerstone shown grounds for limiting

---

1. The conclusion that the record does not establish that Zenith's termination of the subcontract constitutes a breach is not inconsistent with *Ashker v. Aurora Med. Group, Inc.*, 841 N.W.2d 297, 299 (Wis. App. 2013), the sole Wisconsin case applying Wisconsin law that Cornerstone cites in moving for summary judgment. (The parties' summary-judgment submissions do not expressly address choice of law, but they appear to presume that Wisconsin law governs. Section 30.7 of the subcontract oddly provides, "This Agreement shall be governed by and construed pursuant to the laws of the jurisdiction wherein the Project is located, unless a more convenient location is otherwise mutually agreed upon." ECF No. 133-3, at 13. The project is in Wisconsin, and no one has suggested that "a more convenient location [was] mutually agreed upon." *Id.*) In *Ashker*, the defendant invoked a for-cause termination provision, even though it had not given the plaintiff written notice of the breach and 30 days to cure, as the contract required, instead defending that the plaintiff's breach was incurable, an argument the courts rejected. As explained above, the subcontract here does not clearly require Zenith to give notice and time to cure all grounds for termination in all instances. Section 3.3 of the subcontract at issue may be understood to allow termination without notice if, among other things, Cornerstone "d[id] not prosecute the Work vigorously, as reasonably determined by Contractor", *id.* at 5, and the record does not foreclose the possibility that Zenith will prove that it properly terminated the subcontract on those grounds. Finally, while sections 3.4 and 23.2 of the subcontract contain notice-and-cure requirements, the record

Zenith's ability to justify its termination of the contract based on evidence it may present at trial. The admissibility of any such evidence, whether on relevance grounds or otherwise, is not a matter properly decided under Rule 56 on this record. That is a matter to be addressed, if at all, at trial.

---

does not establish that no reasonable fact finder could find that Zenith provided the requisite notice and opportunity to cure under those sections.

This conclusion is also consistent with *Virgin Pulse Inc. v. Schneider Enterprise Resources LLC*, No. 20-C-1691, 2022 WL 4328681 (E.D. Wis. Sept. 19, 2022), which Cornerstone also cites in support of its motion, arguing that Zenith was required to "notify Cornerstone of the specific grounds for declaring a default, rather than merely providing some vague communication regarding dissatisfaction with Cornerstone's performance." ECF No. 133, at 6 (citing *Virgin Pulse*, 2022 WL 4328681, at *6). But the communication at issue in *Virgin Pulse* "merely outlined an agenda and discussion items for a meeting between the parties." 2022 WL 4328681, at *6; see *id.* at *2 (describing this as an email sent, "[p]rior to the meeting, . . . to set an agenda and to provide relevant questions that needed answering at the meeting"). The court in *Virgin Pulse* determined that "[n]o reasonable jury could conclude that [this] email served as a notice of default or triggered" the applicable "21-day period to cure." *Id.* at *6. The same is not true here. As already discussed, Zenith's July 18 email, with the DOT's July 18 letter attached, detailed numerous issues with Cornerstone's performance and a variety of consequences that could result if those issues were not promptly corrected, including schedule delays and liquidated damages. These communications were hardly "vague" expressions of "dissatisfaction with Cornerstone's performance." ECF No. 133, at 6. At the least, as already stated, a reasonable fact finder could find that Zenith's July 18 email *was* an effective written notice of default for purposes of section 23.2 of the subcontract at issue here.

*Virgin Pulse* also addresses a party's argument, in response to a breach-of-contract claim, that "it was not required to give . . . an opportunity to cure because the breach was 'incurable.'" 2022 WL 4328681, at *5. Zenith cites this portion of *Virgin Pulse* in support of an argument, in the alternative: that assuming its July 18 email was an effective written notice of default for purposes of section 23.2 of the subcontract and *if* Cornerstone were to successfully argue that July 21, 2019, should not be counted as part of Cornerstone's three-day cure period (because it was a Sunday)—which would, perhaps, mean that Zenith sent its July 22 termination letter some portion of a day too soon—Zenith should still prevail because, based on Cornerstone's own conduct, by the time Zenith sent Cornerstone the termination letter, "it would have been physically impossible for Cornerstone to complete its corrective Work" within whatever remained of the time to cure. See ECF No. 136, at 11–12 (asserting that, as of July 22, 2019, when Zenith terminated the subcontract, "Cornerstone's breach was logically incurable"). This issue has no bearing on the court's resolution of Cornerstone's motion for summary judgment against Zenith. For one thing, Cornerstone does not argue that Sunday, July 21, 2019, should not count toward the three-day cure period *if* Zenith had sent proper written notice of default to trigger that period. (Zenith may shadowbox, if it likes, but the court need not referee.) For another, the issue of the curability of any relevant default is only material if Cornerstone proves that Zenith denied Cornerstone the notice and opportunity to cure to which the subcontract entitled it. Cornerstone may do that at trial. Until and unless it does so, however, the issue is too attenuated from the matter at hand to warrant judicial consideration and resolution.

III

For the second time in this proceeding, West Bend moves for summary judgment against Zenith. Zenith seeks to recover from West Bend on a bond allegedly issued by West Bend to insure the performance of the subcontract between Cornerstone and Zenith. West Bend denies any liability to Zenith on the bond. West Bend first moved for summary judgment against Zenith in December 2021, asserting that the bond it issued does not insure the performance of the subcontract that Zenith and Cornerstone executed and, if it does, that Zenith failed to satisfy the conditions precedent to West Bend's liability under the bond. The court denied that motion in July 2022.

In May 2023 West Bend sought leave to file a second motion for summary judgment against Zenith, based on evidence obtained during discovery, namely the November 2022 deposition testimony of Cecelia McCormack, one of Zenith's lawyers. The court held a status conference and granted West Bend leave to file another motion for summary judgment against Zenith. Based on a thorough review of the record, that decision was improvident, and the court would be justified in reconsidering it. Nevertheless, as West Bend's second motion for summary judgment has been presented and the court can decide that motion without imposing upon Zenith the costs of opposing it, the court will do so. For the reasons set forth below, the motion is denied.

A

As was true when the court considered West Bend's first motion for summary judgment against Zenith, for the most part, West Bend and Zenith do not dispute what happened here, and the material facts are much the same: After Zenith entered into a highway-construction contract with the DOT, it sought to hire Cornerstone as a subcontractor to do some of the required work. West Bend then issued a bond insuring the performance of an agreement between Zenith and Cornerstone (or at least West Bend does not dispute this for purposes of the current motion). Soon after, Zenith and Cornerstone executed a subcontract and work began. Months later Zenith fired

Cornerstone and hired a replacement subcontractor without first giving West Bend notice and the opportunity to complete the subcontracted work itself, arrange for the completion of the work, or otherwise act (or decline to act) as described in the bond. Zenith later made a demand on the bond, and West Bend denied all liability, citing this lack of notice, among other things.

1

As mentioned above, West Bend's first motion for summary judgment against Zenith was based in large part on Zenith's asserted failure to satisfy the conditions precedent to West Bend's liability under the bond. As discussed in the decision and order denying that motion, the conditions precedent to West Bend's liability are set forth in section 3 of the bond. See ECF No. 82, at 9–12. That section reads as follows:

> **§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after
>
> > **.1** the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;
> >
> > **.2** the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

**.3** the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

ECF No. 71-11, at 2; see also *id.* at 1 (identifying Cornerstone as "Contractor", Zenith as "Owner", and West Bend as "Surety"); ECF No. 82, at 9.

As the record made clear, and Zenith conceded, it did not comply with the requirements of section 3.1 of the bond. But, pursuant to section 4 of the bond, "except to the extent that the Surety demonstrates actual prejudice", "[f]ailure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to . . . or release the Surety from its obligations" under the bond. ECF No. 71-11, at 2. West Bend did not raise actual prejudice resulting from Zenith's failure to comply with the requirements of section 3.1 of the bond as part of its first motion for summary judgment against Zenith. See ECF No. 82, at 12 n.2. Accordingly, the court considered only whether Zenith satisfied the second and third conditions precedent to West Bend's liability under the bond and denied the relevant part of West Bend's first motion for summary judgment because, based on the record then before the court, those conditions were satisfied. ECF No. 82, at 16.

2

So, what has changed? And what does McCormack's deposition testimony add to the record that was before the court when West Bend's first motion for summary judgment was decided? The answer to both questions is, not much.

West Bend now relies on section 6 and, by extension, section 5 of the bond. Those sections read as follows:

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

> **.1** After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

> **.2** Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

ECF No. 127-5, at 27.

West Bend now argues that it is entitled to summary judgment against Zenith because Zenith never provided the "additional written notice" and demand for performance described in section 6 of the bond, thereby denying West Bend the opportunity to act (or waive its right to do so) under section 5 of the bond. As a result, West Bend asserts, it cannot be deemed in default, and Zenith is not and was not authorized to enforce any remedy available to it under the bond, including replacing Cornerstone with another subcontractor.

Even if West Bend is right about all this, however, what prevented it from raising this argument nearly two years ago when it first moved for summary judgment against Zenith? As noted above, West Bend points to McCormack's deposition testimony, which was taken in November 2022, after the court denied West Bend's first motion for summary judgment. At that deposition, as relevant to West Bend's present motion, McCormack was asked whether she was "aware of any notice that was sent to West Bend pursuant to [section] 6 . . . demanding that the surety, West Bend, perform its obligations under the bond", and McCormack answered, "No." ECF No. 127-9, at 11 (28:11–16). But the lack of any such notice is easily inferred from the record that was before the court when West Bend first moved for summary judgment: West Bend's list of purportedly undisputed material facts, in West Bend's opening brief in support of that motion, details the communications it received from Zenith about the subcontract and the bond; Zenith admitted the broad facts about those communications; and nothing in West Bend's statement of material facts, Zenith's response to it, or the record as a whole suggested that Zenith ever made a written demand under section 6 that West Bend perform its obligations under section 5 of the bond. See ECF No. 71-38, at 9–13, ¶¶14–24. More to the point, West Bend certainly knew, long before this adversary proceeding even started, whether Zenith had ever invoked section 6 to demand West Bend's performance of its obligations under section 5 of the bond. Indeed, West Bend alleged, in September 2021, in its affirmative defenses to Zenith's

claim on the bond—part of its first substantive filing in this proceeding—that Zenith "waived its rights under . . . [the] Bond" when it replaced Cornerstone "without making a timely demand upon West Bend to perform under Section 5 of the Bond". ECF No. 34, at 20, ¶31. In sum, it is far from clear what West Bend thinks McCormack's deposition testimony added or why it thinks that testimony warranted another dispositive motion.

West Bend could have and should have raised this issue when it first moved for summary judgment against Zenith, rather than imposing on the court and the parties the burden of having to consider it on a second such motion, which has only delayed the resolution of the claims in this proceeding. The court can only assume that West Bend simply failed to raise this argument on its first motion for summary judgment and, when that motion failed, manufactured a flimsy pretext for a second bite at the apple. As already stated, the court would be well within its discretion to reconsider, as improvidently granted, the prior order allowing West Bend to file its second motion for summary judgment. But the damage has been done. The court will decide the motion on the merits without further cost to the parties or delay in the proceedings.

B

West Bend's latest argument for summary judgment against Zenith is as follows: Zenith is permitted to exercise its remedies under the bond, including terminating and replacing the subcontractor, *only* if West Bend failed to act as described in section 5 of the bond within seven days after Zenith gave West Bend written notice and a demand for performance in accordance with section 6 of the bond. West Bend maintains that, when Zenith replaced Cornerstone with another subcontractor without notice to West Bend and without giving West Bend an opportunity to act as described in section 5 of the bond, Zenith either (1) waived its right to enforce its remedies under the bond or (2) materially breached the bond's terms, releasing West Bend from any further obligations under it. See ECF No. 127, at 3–5.

This argument rests on West Bend's proffered construction of sections 5 and 6 of the bond. Specifically, West Bend's argument only holds water if section 5 of the bond affords West Bend *rights* and section 6 of the bond imposes on Zenith the *obligation* to give West Bend the opportunity to exercise those rights. West Bend's argument also depends on the notion that because section 6 *permits* the owner, Zenith, "to enforce any remedy available to the Owner" upon the surety's failure to perform its obligations under section 5 within seven days after the owner demands that it do so, the owner can *only* enforce its available remedies if it makes a demand under section 6 and *then* the surety fails to timely perform. As West Bend puts it in its brief, "A surety's failure to respond to a written notice under Section 6 is the necessary default under the performance bond which gives rise to any remedy to the Owner, including the right to hire a completion contractor." ECF No. 127, at 5 (citing *Schuff Steel Co. v. Bosworth Steel Erectors*, No. 18-CV-0435, 2022 WL 4534729 (D.D.C. Sept. 28, 2022)).[2]

West Bend's construction of the applicable bond terms is not the only reasonable one. For that matter, West Bend's is not clearly the best reading of those terms under the governing law. Under Wisconsin law, provisions of insurance contracts, including surety bonds, are generally given their plain or ordinary meaning. *Danbeck v. Am. Fam. Mut. Ins. Co.*, 629 N.W.2d 150, 153–54 (Wis. 2001) (first citing *Henderson v. State Farm Mut. Auto. Ins. Co.*, 208 N.W.2d 423, 426 (Wis. 1973); and then citing *Hull v. State Farm Mut. Auto. Ins. Co.*, 586 N.W.2d 863, 867 (Wis. 1998)); see also *Wiegel v. Sentry Indem. Co.*, 287 N.W.2d 796, 799–800 (Wis. 1980). Given this standard, another reasonable

---

2.      *Schuff Steel* does not apply Wisconsin law. It instead applies substantive law that seems to presume that a failure to satisfy any notice requirement in a surety bond is sufficient to establish a material default or failure to satisfy a condition precedent to the surety's liability. Whether that is true under the substantive law that *Schuff Steel* applies, it is not true under Wisconsin law. Also, as discussed below, West Bend has not conclusively demonstrated that section 6 of the bond at issue here actually imposes any notice requirements on Zenith, as opposed to simply offering Zenith the means to force the surety's hand if it is not acting as *it* is required to under the bond.

construction of the relevant terms of the bond, and arguably the better one, is that section 5 imposes obligations on *West Bend* and section 6 affords *Zenith* the right to demand that those obligations be met within the specified period of time.

Section 5's plain language, read in context, does not necessarily give West Bend the *right* to do anything, other than to select from a list of actions that it *must* take upon the satisfaction of the conditions stated in section 3. That is, section 5 seems to *obligate* West Bend to "take one of the . . . actions" listed in that section and to do so both "promptly and at [its] expense". ECF No. 127-3, at 32. True, one of the actions the surety may take, listed in section 5.4, is to "[w]aive its *right* to perform and complete, arrange for completion, or obtain a new contractor", but even then, the surety is *required*, "with reasonable promptness under the circumstances", to either pay on the bond or deny liability. *Id.* (emphasis added). And, as noted above, section 4 expressly addresses the extent to which the owner's "[f]ailure . . . to comply with the notice requirement in Section 3.1 . . . constitute[s] a failure to comply with a condition precedent to . . . or release[s] the Surety from its *obligations*" under the bond, and those obligations surely include section 5's requirement that the surety "take one of the . . . actions" listed, once "the Owner has satisfied the conditions of Section 3". *Id.* (emphasis added).

If section 5 is so read, then section 6 merely allows the owner (i.e., affords the *owner* the right) to demand that the *surety* perform its obligations under section 5, "[i]f the Surety does not proceed as provided in Section 5 with reasonable promptness", and to "enforce any remedy available to the Owner", if the surety fails to do so within seven days after such a demand is made. *Id.* Under this reading, section 6 of the bond gives the owner the means to compel the surety to act, if it is not doing so, and to enforce its remedies under the bond, but does not obviously make compliance with section 6's provision for written notice and a demand for performance a prerequisite to the enforcement of those remedies. In fact, a separate provision of section 6 can be read to provide that "[i]f . . . the Surety has denied liability, in whole or in part," as West Bend

clearly did here, then "without further notice the Owner shall be entitled to enforce any remedy available to the Owner." ECF No. 127-3, at 32.

Ordinarily defined, a "right" is "a power . . . to which one is entitled"—i.e., a "right" is what one *may*, but need not, do—while an "obligation" is "what one *must* do". See *Webster's Third New International Dictionary* 1556 & 1955 (2002) (emphasis added). Notwithstanding the use of "right" in section 5.4, section 5 seems to impose an obligation: once the conditions of section 3 are satisfied, "the Surety *shall* promptly and at the Surety's expense take one of the . . . [specified] actions". ECF No. 127-3, at 32 (emphasis added). Section 6 describes the consequences to the surety for failing to satisfy that obligation, including but not clearly limited to the consequences to the surety for failing to satisfy that obligation within "seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform". *Id.* Among those consequences: "the Owner shall be entitled"—that is, the owner has the *right*—"to enforce any remedy available to the Owner." *Id.* Section 6 may be the *only* source of the owner's right to enforces its remedies against the surety, but it may not be. The record now before the court does not conclusively resolve that issue.

At the least, the record before the court does not foreclose reading the relevant bond terms to entitle the owner, Zenith, to enforce the bond's remedies without making a demand under section 6 that West Bend comply with its obligations under section 5. And under this reading, the record—even if viewed in *West Bend's* favor, contrary to the standard applicable to summary-judgment motions—establishes nothing more than that Zenith declined to exercise a power, to which it was entitled under section 6 of the bond, to demand West Bend's performance of its obligation to act under section 5 of the bond. Perhaps it goes without saying, but a breach of contract does not ordinarily result when a party simply opts not to exercise one or more of its rights under a contract. Accordingly, if this reading of the relevant bond terms is correct, that would seem to

defeat West Bend's claim that *Zenith* breached any of them, materially or otherwise, by not making a demand under section 6.

2

Even assuming for the moment that West Bend's construction of sections 5 and 6 of the bond is correct, the record before the court does not establish, beyond all genuine disputes of material fact, that Zenith *materially* breached the bond's terms or that, if it did, West Bend did not waive the materiality of that breach by its conduct. As explained in the decision and order denying West Bend's first motion for summary judgment:

> Under Wisconsin law, "[f]or a breach to be material, it must be so serious as to destroy the essential object of the agreement." *Ranes v. Am. Fam. Mut. Ins. Co.*, 580 N.W.2d 197, 200 (Wis. 1998) (citing *Appleton State Bank v. Lee*, 148 N.W.2d 1, 3 (Wis. 1967)). "When the breach is 'relatively minor' and not 'of the essence,' the nonbreaching party is not excused from performance." *Id.* (quoting *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 77 (Wis. 1996)). But "even where such a material breach has occurred, the non-breaching party may waive the claim of materiality through its actions." *Mgmt. Computer Servs., Inc.*, 557 N.W.2d at 78 (citing *Entzminger v. Ford Motor Co.*, 177 N.W.2d 899, 901 (Wis. 1970)). Importantly, "whether a party's breach excuses future performance of the contract by the non-breaching party presents a question of fact." *Id.* (citing *Shy v. Indus. Salvage Material Co.*, 58 N.W.2d 452, 456 (Wis. 1953)).

ECF No. 82, at 15. Simply put, "[u]nder Wisconsin law, materiality and waiver are issues of fact, and", just like when West Bend first moved for summary judgment, it "has not shown that the evidence is such that it is entitled to judgment as a matter of law because no reasonable factfinder could side with Zenith on those issues." *Id.* at 16 (citing *Entzminger*, 177 N.W.2d at 901).

Zenith's failure to make a demand, pursuant to section 6 of the bond, that West Bend perform its obligations under section 5 of the bond *could have* been a material breach excusing West Bend from further performance, at least assuming West Bend's reading of the bond is the right one. And West Bend may well prove at trial that it was.

But the record before the court does not establish that it was or, in more proper terms, that no reasonable fact finder could find that it was *not*. West Bend presents little apart from the language of the bond to show that Zenith's failure to provide notice under that section was so serious a breach of the bond's terms as to excuse West Bend's further performance or that, even if it was, West Bend did not waive the materiality of the breach by its later conduct. West Bend instead relies in large part on caselaw stating that "notice provisions are of the 'essence' of the surety contract" and, as a result, the notice provisions at issue here, as West Bend construes them, are inherently so central to bonds like the one it issued that any deviation from them by any party, anywhere, to any such bond *ipso facto* releases the surety from its obligations under the bond. *Schuff Steel Co.*, 2022 WL 4534729, at *9–10, cited in ECF No. 127, at 5 & 12–14; see also, e.g., ECF No. 127, at 17 (asserting that the Eleventh Circuit's nonprecedential 2017 opinion in *International Fidelity Insurance Co. v. Americaribe-Moriarty JV*, 681 Fed. App'x 771, "illustrate[s] how giving the surety notice of termination *after* the obligee hires a completion contract is *prejudicial* to [the] surety as a matter of law"). As the court's decision and order denying West Bend's first motion for summary judgment explains, however, "[w]hether other courts applying the substantive law of other jurisdictions have taken that approach (including equating materiality and prejudice), it is clearly at odds with Wisconsin law, as it ignores the case-specific nature of the 'materiality' inquiry (and any 'waiver' inquiry that might follow)". ECF No. 82, at 15–16.

If nothing else, the record reveals a genuine dispute of material fact as to whether West Bend waived the materiality of Zenith's breach, if any, of section 6 of the bond. West Bend sent Zenith a detailed letter denying liability on the bond. That letter sets forth, with specificity, the many ways in which West Bend determined, after investigation, that Zenith breached the bonded subcontract by wrongfully terminating Cornerstone, and it goes on to explain how, in West Bend's view, Zenith failed to satisfy the conditions precedent to West Bend's liability under section 3 of the bond, but it

makes no mention whatsoever of section 6. See ECF No. 127-5, at 74–79. Construing this letter, and the record as a whole, in the light most favorable to Zenith, as the court must do in resolving West Bend's present motion, it seems that West Bend did not consider the specific lack of a demand for performance under section 6 to be a material breach on Zenith's part until it became a potentially viable litigation strategy to say that it was. At the very least, this casts serious doubt on West Bend's present assertion of materiality.

3

West Bend's only other meaningful argument for summary judgment is based on *State Bank of Viroqua v. Capitol Indemnity Corp.*, 214 N.W.2d 42 (Wis. 1974). West Bend also relied on this case when it first moved for summary judgment, but it focused on the broad principles that case describes while ignoring the actual text of the bond at issue and the substantial degree to which that text differs from that of the bond at issue here. See ECF No. 82, at 11–13. On this, its second shot at summary judgment, West Bend does much the same thing, again misconstruing the holding and rationale of the case, asserting that it "holds that the failure to give proper notice under a surety bond results in a discharge of surety as a matter of law entitling the surety to summary judgment" and that "[l]ack of prejudice is immaterial if the surety is denied its contractual right." See ECF No. 127, at 10 (citing *State Bank of Viroqua*, 214 N.W.2d at 45). *State Bank of Viroqua* does so hold, but *only* with respect to the bond at issue in that case. Specifically, the case holds that a provision of a bond expressly requiring and prescribing periods of time for notice to the surety of any covered loss *before* legal proceedings could begin set forth *conditions precedent* to the surety's liability on the bond—thus, under that provision, whether the surety suffered actual prejudice from a failure to comply with those conditions was irrelevant. See 214 N.W.2d at 45–47. West Bend does not expressly argue that section 6 contains any conditions precedent to its liability under the bond. Moreover, for the reasons stated above, its effort to cast section 6 as imposing any

obligation on Zenith lacks sufficient textual and evidentiary support to prevail on summary judgment. So, *State Bank of Viroqua* is not dispositive here.

More importantly, as noted in the decision and order denying West Bend's first motion for summary judgment, the "broad[] legal principle" underlying *State Bank of Viroqua* is that "'a contract means what it says' even if it is not 'phrased in "terms of art"'." ECF No. 82, at 11 (quoting 214 N.W.2d at 46). As applied in that case, the logical consequence of this principle was that a bond may impose conditions precedent to the surety's liability, even if the bond does not explicitly describe them that way, if they operate as such conditions. Again, nothing about the text of the bond at issue here suggests that section 6 imposes conditions precedent to West Bend's liability on the bond—and it would make little sense to construe the bond such that a provision about a demand for performance of the surety's obligations states a condition precedent to those same obligations—or that a failure to demand performance under section 6, as West Bend reads that provision, automatically releases West Bend from its obligations under the bond. See *id.* at 11 ("A bond could certainly be written to release the surety from any obligation under it if, for example, the 'Owner', by its unilateral action, denies the surety a reasonable opportunity to act in certain ways, but the bond at issue here says no such thing."). The conditions precedent to West Bend's liability under the bond at issue here are set forth in section 3. See *id.* at 11–12. The first of those conditions, described in section 3.1, is the only provision of the bond that clearly *requires* the owner to give the surety advance notice of anything—it requires the owner to give the surety advance notice "that the Owner is considering declaring a Contractor Default", among other things—but, as already noted, section 4 expressly provides that a failure "to comply with the notice requirement in Section 3.1 shall *not* constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates *actual prejudice*." See ECF No. 127-5, at 32 (emphasis added). "[N]either *State Bank of Viroqua* nor its rationale,

however persuasive, justifies rewriting the bond at issue", including to relieve West Bend of its burden to demonstrate actual prejudice as the bond requires, "to give West Bend the benefit of opportunities for which it did not bargain." See ECF No. 82, at 12.

IV

For these reasons, Cornerstone's and West Bend's motions for summary judgment are denied.

#####